# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

|  |  |  |
|---|---|---|
| E.I. DU PONT DE NEMOURS AND COMPANY, | ) ) ) |  |
| Plaintiff, | ) ) |  |
| v. | ) ) | NO. 3:07-00949 JUDGE HAYNES |
| AMERICAN NONWOVENS CORPORATION, | ) ) ) |  |
| Defendant. | ) |  |

## M E M O R A D U M

Plaintiff, E.I. Du Pont de Nemours and Company ("DuPont"), a Delaware corporation, filed this action under 28 U.S.C. § 1332, the federal diversity jurisdiction statute, against Defendant America Nonwovens Corporation ("ANC"), a Mississippi corporation, for breach of contract, breach of implied contract, quantum meruit, unjust enrichment, restitution, and promissory estoppel. Plaintiff's claims arise out of ANC's alleged failure to repay money owed to DuPont under certain agreements between the two companies. DuPont seeks repayment of amounts allegedly owed to it under those agreements.

Before the Court are ANC's motion for partial summary judgment (Docket Entry No. 46) and DuPont's motion for summary judgment (Docket Entry No. 50).

In the motion for partial summary judgment, ANC argues that any claim that ANC breached the contract for the advanced payment of funds toward future purchases of goods (the "Advance Agreement") is time-barred. ANC further argues that any alleged breach of subsequent oral promises to DuPont arising from the Advance Agreement were not supported by

-1-

consideration and/or are time-barred. Thus, ANC argues it is entitled to partial summary judgment on any claims arising out of the Advance Agreement.

In response to ANC's motion for partial summary judgment, DuPont argues that its claims under the Advance Agreement are timely, and that subsequent promises to repay DuPont under the Advance Agreement are supported by consideration and not time-barred.

In its motion for summary judgment, DuPont argues that the Advance Agreement functioned as a loan agreement and thus is not barred by the applicable statute of limitations. DuPont further argues that all other requirements for an enforceable contract have been met, and thus it is entitled to full repayment under the Advance Agreement. DuPont also argues that ANC breached another contract between the parties for the provision of engineering services by DuPont to ANC (the "Engineering Services Agreement") and that DuPont is entitled to recovery under a breach of contract or quantum meruit theory.

In response to DuPont's motion for summary judgment, ANC incorporates its own motion for partial summary judgment and argues any claims under the Advance Agreement are time-barred. ANC does not respond to DuPont's arguments regarding the Engineering Services Agreement.

For the reasons set forth below, the Court concludes that ANC's motion for partial summary judgment should be granted as DuPont's claims under the Advance Agreement are time-barred. The Court further concludes that DuPont's motion for summary judgment should be granted in part and denied in part. As noted above, DuPont's claims under the Advance Agreement are time-barred, but its claims under the Engineering Services Agreement are valid and entitled to summary judgment as no material factual dispute exists with regard to that

-2-

agreement.

## I. Findings of Fact[1]

In 2000, DuPont sought a supplier from which it could potentially purchase low-priced polyester fibers ("scrim"). (Docket Entry No. 55, Defendant's Response to Plaintiff's Statement of Undisputed Facts, at ¶ 2). DuPont approached ANC regarding its potential ability to supply scrim and discussed the fact that ANC was not in a position to supply product until its new line started. Id. at ¶ 3. ANC was interested in potentially selling scrim to DuPont, but ANC's new production line was not yet complete. Id. at ¶ 5. It was somewhat unclear whether DuPont would actually buy product from ANC, and if it did, in what quantity. Id. at ¶ 6.

ANC communicated to DuPont that ANC needed $500,000.00 for business expenses, and requested that DuPont advance the funds. Id. at ¶ 7. DuPont agreed to advance the sum of $500,000.00 in early August 2000 so that ANC would be able to supply scrim and DuPont would be able to enter into contracts to purchase scrim at future dates. Id. at ¶ 8. DuPont argues that this advance was in effect a loan, but ANC disputes this contention. Id. at ¶ 9. Both parties agree that ANC covenanted to repay the $500,000.00 through discounts on future product purchases, or in the absence of sufficient purchases, in cash, no later than November 1, 2001. (Docket Entry No. 58, Plaintiff's Response to Defendant's Statement of Undisputed Material

---

[1]Upon a motion for summary judgment, the factual contentions are viewed in the light most favorable to the party opposing the motion for summary judgment. Duchon v. Cajon Co., 791 F.2d 43, 46 (6th Cir. 1986) app. 840 F.2d 16 (6th Cir. 1988) (unpublished opinion). As will be discussed infra, upon the filing of a motion for summary judgment, the opposing party must come forth with sufficient evidence to withstand a motion for directed verdict, Anderson v. Liberty Lobby, 477 U.S. 242, 247-52 (1986), particularly where there has been an opportunity for discovery. Celotex Corp. v. Catrett, 477 U.S. 317 (1986). Under the applicable law, there are not any material factual disputes and this section constitutes findings of fact under Fed. R. Civ. P. 56(d).

-3-

Facts, at ¶ 1).

DuPont issued Purchase Order FML2850 to ANC, which included language stating, in relevant part:

> To cover prepayment cost of $500,000 for "PET scrim" for DuPont Old Hickory during the next twelve months in exchange for a lower unit price per square yard of "PET scrim". The prepayment cost is to be fully amortized within 12 months.
>
> \* \* \*
>
> In the event that American Nonwovens is unable to supply fabric to DuPont Old Hickory for reasons such as bankruptcy, major equipment failures, natural disasters, etc., American Nonwovens will take the necessary steps to insure DuPont will be promptly reimbursed any remaining portion of the $500,000 prepayment.
>
> DuPont Old Hickory presently forecasts purchasing approx. 53.778 million square yards of products within the twelve month time frame. Each square yard of fabric will be discounted $.01/square yard to cover the cost of prepayment. In the event that a fabric price is reduced or changed, the discount of $0.01 will stay the same until 53.778 million square yards of product are purchased (taking into account any yardage credits due to fabric quality or other reasons). In the event that DuPont Old Hickory purchases are accelerated, the amortization time will be effectively decreased. In the event that DuPont Old Hickory does not intent [sic] to purchase 53.778 million square yards of fabric within the 12 month time frame (rolling 3 month estimates will be provided each month), American Nonwovens will be notified and the remaining portion of the prepayment amount will be due within 15 months from the date of this purchase order.

(Docket Entry 48-3, Exhibit C, E-mail Purchase Order FML2850).

In response to the DuPont Purchase Order, ANC sent an Invoice containing the following language: "Prepayment cost for PET Scrim for DuPont Old Hickory purchased during the next 12 months." (Docket Entry 48-3, Exhibit D, ANC Invoice 842000). DuPont ultimately did purchase some scrim from ANC between August and December 2000, though DuPont characterizes these purchases as "subsequent, separate transactions." (Docket Entry No. 55,

-4-

Defendant's Response to Plaintiff's Statement of Undisputed Facts, at ¶ 13).

Throughout this time period, ANC experienced operability problems with its new production line and resulting defects in the product provided to DuPont. Id. at ¶ 14. Given the quality concerns about ANC's scrim and changes in the marketplace, DuPont decided not to purchase any additional scrim from ANC in or about December 2000. Id. at ¶ 15. At the end of December 2000, the remaining balance on the $500,000.00 advance, including capital costs, was $356,416.20. Id. at ¶ 16-17. ANC's last payment toward the advance occurred in December 2000 and left a balance of $356,416.20. Id. at ¶ 19.

In addition to the Advance Agreement, in September/October 2000, ANC asked DuPont to provide engineering assistance in order to identify and evaluate the production and quality problems on its new line. Id. at ¶ 21. DuPont agreed to assist ANC with its engineering needs and the parties entered into an agreement whereby DuPont would provide engineering services to ANC at cost with no profit to DuPont. Id. at ¶ 22. The parties agreed that the total cost of the services would not exceed $120,000.00. Id. at ¶ 23. DuPont performed the engineering services between approximately January and April 2001. Id. at ¶ 24. On October 17, 2001, DuPont forwarded ANC an invoice in the amount of $86,657.50 for engineering services performed. Id. at ¶ 25. ANC did not dispute the amount of the invoice and made two payments of $9,000.00 each toward the $86,657.50 invoice for engineering services. Id. at ¶ 26. ANC's last payment on the engineering services agreement occurred in February 2002 and left a balance of $68,657.50 owing to DuPont. Id. at ¶ 27.

ANC later made representations regarding the outstanding balances owed to DuPont. Id. at ¶ 28. In correspondence dated September 17, 2001, ANC's owner Don DePriest informed

-5-

DuPont, "Specifically with regard to the advance made to American Nonwovens from DuPont, we expect to be able to retire this over the next several months beginning in November. We will provide a schedule to you by the middle of October." Id. at ¶ 29. In subsequent correspondence dated December 6, 2001, an ANC representative stated, "We remain firm in our intent to see DuPont receive full payment for all monies advanced by it under the long term understanding with American Nonwovens in anticipation of future purchases or representing billings made to American for services performed." Id. at ¶ 30. Finally, in correspondence dated January 25, 2002, an ANC representative stated, "we continue to work on business opportunities which will provide opportunity for both our companies and could also serve as a platform for amortization of the advances made to American by DuPont." Id. at ¶ 31.

In a deposition, Karl Lukach, Global Director of DuPont's Sontara division during the relevant time period and one of DuPont's Rule 30.02 Corporate Designees, testified that he did not consider the $500,000 advanced from DuPont to ANC to be a loan. (Docket Entry No. 58, Plaintiff's Response to Defendant's Statement of Undisputed Material Facts, at ¶ 7). Mr. Lukach considered the advance to be "prepayment against purchases subject to the terms of the purchases and the forecast, which were all spelled out in the documents between ANC and DuPont." Id. at ¶ 8. Mr. Lukach testified that he did not believe that he "had the authority to make a loan," but did also testify that he did possess "purchase authority, you know, quite a lot of dollar purchase authority under many contracts." Id. at ¶¶ 9-10. Finally, Mr. Lukach testified he believed he had authority to enter into the Advance Agreement. Id. at ¶ 11.

## II. Conclusions of Law

"The very reason of the summary judgment procedure is to pierce the pleadings and to

-6-

assess the proof in order to see whether there is a genuine need for trial." Advisory Committee

Notes on Rule 56, Federal Civil Judicial Procedure and Rules (West Ed. 1989). Moreover,

"district courts are widely acknowledged to possess the power to enter summary judgment <u>sua</u>

<u>sponte</u>, so long as the opposing party was on notice that she had to come forward with all of her

evidence." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 326 (1986). <u>Accord</u> <u>Routman v. Automatic</u>

<u>Data Processing, Inc.</u>, 873 F.2d 970, 971 (6th Cir. 1989).

In <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242 (1986), the United States Supreme

Court explained the nature of a motion for summary judgment:

> Rule 56(c) of the Federal Rules of Civil Procedure provides that summary
> judgment 'shall be rendered forthwith if the pleadings, depositions, answers to
> interrogatories, and admissions on file, together with the affidavits, if any, show
> that there is no genuine issue as to any material fact and that the moving party is
> entitled to a judgment as a matter of law.' By its very terms, this standard
> provides that the mere existence of <u>some</u> alleged factual dispute between the
> parties will not defeat an otherwise properly supported motion for summary
> judgment; the requirement is that there be no <u>genuine</u> issue of <u>material</u> fact.
>
> <u>As to materiality, the substantive law will identify which facts are material. Only
> disputes over facts that might affect the outcome of the suit under the governing
> law will properly preclude the entry of summary judgment.</u>  Factual disputes that
> are irrelevant or unnecessary will not be counted.

477 U.S. at 247-48 (emphasis in the original and added in part). Earlier the Supreme Court

defined a material fact for Rule 56 purposes as "[w]here the record taken as a whole could not

lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"

<u>Matsushita Electrical Industrial Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986) (citations

omitted).

A motion for summary judgment is to be considered after adequate time for discovery.

<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 326 (1986). Where there has been a reasonable

-7-

opportunity for discovery, the party opposing the motion must make an affirmative showing of the need for additional discovery after the filing of a motion for summary judgment. <u>Emmons v. McLaughlin</u>, 874 F.2d 351, 355-57 (6th Cir. 1989). <u>But see</u> <u>Routman v. Automatic Data Processing, Inc.</u>, 873 F.2d 970, 971 (6th Cir. 1989).

There is a certain framework in considering a summary judgment motion as to the required showing of the respective parties as described by the Court in <u>Celotex</u>:

> Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. . . . [W]e find no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials negating the opponent's claim.

<u>Celotex</u>, 477 U.S. at 323 (emphasis deleted).

As the Court of Appeals explained, "[t]he moving party bears the burden of satisfying Rule 56(c) standards." <u>Martin v. Kelley</u>, 803 F.2d 236, 239, n. 4 (6th Cir. 1986). The moving party's burden is to show "clearly and convincingly" the absence of any genuine issues of material fact. <u>Sims v. Memphis Processors, Inc.</u>, 926 F.2d 524, 526 (6th Cir. 1991) (quoting <u>Kochins v. Linden-Alimak, Inc.</u>, 799 F.2d 1128, 1133 (6th Cir. 1986)). "So long as the movant has met its initial burden of 'demonstrating the absence of a genuine issue of material fact,' the nonmoving party then 'must set forth specific facts showing that there is a genuine issue for trial.'" <u>Emmons v. McLaughlin</u>, 874 F.2d 351, 353 (6th Cir. 1989) (quoting <u>Celotex</u> and Rule 56(e)).

Once the moving party meets its initial burden, the Court of Appeals warned that "[t]he respondent must adduce more than a scintilla of evidence to overcome the motion [and]. . . must

-8-

'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989) (quoting Liberty Lobby, 477 U.S. at 257). Moreover, the Court of Appeals explained:

> The respondent must 'do more than simply show that there is some metaphysical doubt as to the material facts.' Further, '[w]here the record taken as a whole could not lead a rational trier of fact to find' for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is 'implausible.'

Street, 886 F.2d at 1480 (cites omitted). See also Hutt v. Gibson Fiber Glass Products, No. 89-5731 (6th Cir. filed September 19, 1990) ("A court deciding a motion for summary judgment must determine 'whether the evidence presents a sufficient disagreement to require a submission to the jury or whether it is so one-sided that one party must prevail as a matter of law.'" (quoting Liberty Lobby, 477 U.S. at 251-52)).

If both parties make their respective showings, the Court then determines if the material factual dispute is genuine, applying the governing law.

> More important for present purposes, summary judgment will not lie if the dispute about a material fact is 'genuine' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.

> * * *

> Progressing to the specific issue in this case, we are convinced that the inquiry involved in a ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits. If the defendant in a run-of-the-mill civil case moves for summary judgment or for a directed verdict based on the lack of proof of a material fact, the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could

-9-

> find by a preponderance of the evidence that the plaintiff is entitled to a verdict --
> 'whether there is [evidence] upon which a jury can properly proceed to find a
> verdict for the party producing it, upon whom the onus of proof is imposed.'

Liberty Lobby, 477 U.S. at 248, 252 (citation omitted and emphasis added).

It is likewise true that:

> [I]n ruling on a motion for summary judgment, the court must construe the
> evidence in its most favorable light in favor of the party opposing the motion and
> against the movant. Further, the papers supporting the movant are closely
> scrutinized, whereas the opponent's are indulgently treated. It has been stated
> that: 'The purpose of the hearing on the motion for such a judgment is not to
> resolve factual issues. It is to determine whether there is any genuine issue of
> material fact in dispute. . . .'

Bohn Aluminum & Brass Corp. v. Storm King Corp., 303 F.2d 425, 427 (6th Cir. 1962) (citation

omitted). As the Court of Appeals stated, "[a]ll facts and inferences to be drawn therefrom must

be read in a light most favorable to the party opposing the motion." Duchon v. Cajon Company,

791 F.2d. 43, 46 (6th Cir. 1986) app. 840 F.2d 16 (6th Cir. 1988) (unpublished opinion) (citation

omitted).

The Court of Appeals further explained the District Court's role in evaluating the proof

on a summary judgment motion:

> A district court is not required to speculate on which portion of the record the
> nonmoving party relies, nor is it obligated to wade through and search the entire
> record for some specific facts that might support the nonmoving party's claim.
> Rule 56 contemplates a limited marshalling of evidence by the nonmoving party
> sufficient to establishing a genuine issue of material fact for trial. This
> marshalling of evidence, however, does not require the nonmoving party to
> "designate" facts by citing specific page numbers. Designate means simply "to
> point out the location of." Webster's Third New International Dictionary (1986).

> Of course, the designated portions of the record must be presented with enough
> specificity that the district court can readily identify the facts upon which the
> nonmoving party relies; but that need for specificity must be balanced against a
> party's need to be fairly apprised of how much specificity the district court

-10-

requires. This notice can be adequately accomplished through a local court rule or a pretrial order.

InterRoyal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989) cert. denied 494 U.S. 1091

(1990). Here, the parties have given some references to the proof upon which they rely. Local

Rules 56.01(b)-(d) require a showing of undisputed and disputed facts.

     In Street, the Court of Appeals discussed the trilogy of leading Supreme Court decisions,

and other authorities on summary judgment and synthesized ten rules in the "new era" on

summary judgment motions

    1.     Complex cases are not necessarily inappropriate for summary judgment.

    2.     Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

    3.     The movant must meet the initial burden of showing 'the absence of a genuine issue of material fact' as to an essential element of the non-movant's case.

    4.     This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

    5.     A court should apply a federal directed verdict standard in ruling on a motion for summary judgment. The inquiry on a summary judgment motion or a directed verdict motion is the same: 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that the party must prevail as a matter of law.'

    6.     As on federal directed verdict motions, the 'scintilla rule' applies, i.e., the respondent must adduce more than a scintilla of evidence to overcome the motion.

    7.     The substantive law governing the case will determine what issues of fact are material, and any heightened burden of proof required by the substantive law for an element of the respondent's case, such as proof by clear and convincing evidence, must be satisfied by the respondent.

    8.     The respondent cannot rely on the hope that the trier of fact will disbelieve

-11-

the movant's denial of a disputed fact, but must present affirmative evidence in order to defeat a properly supported motion for summary judgment.'

9.      The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

10.      The trial court has more discretion than in the 'old era' in evaluating the respondent's evidence. The respondent must 'do more than simply show that there is some metaphysical doubt as to the material facts.' Further, '[w]here the record taken as a whole could not lead a rational trier of fact to find' for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is implausible.

Street, 886 F.2d at 1479-80.

The Court has distilled from these collective holdings four issues that are to be addressed upon a motion for summary judgment: (1) has the moving party "clearly and convincingly" established the absence of material facts?; (2) if so, does the plaintiff present sufficient facts to establish all the elements of the asserted claim or defense?; (3) if factual support is presented by the nonmoving party, are those facts sufficiently plausible to support a jury verdict or judgment under the applicable law?; and (4) are there any genuine factual issues with respect to those material facts under the governing law?

### A. Advance Agreement

As to the governing legal principles for a breach of contract claim, as a diversity action, state law applies. In a diversity action, the District Court is obliged to apply the law of the forum. Erie Railroad Co. v. Tompkins, 304 U.S. 64 (1938). In addition, the conflict law of the forum determines which state's substantive law shall apply. Klaxton Co. v. Stentor Electric Mfg., 313 U.S. 487 (1941). Under Tennessee law, the validity of a contract and the substantive rights of the parties thereunder are governed by the law which the parties intended to govern their relations,

-12-

with the legal presumption that absent a contrary intent, the parties intended the law of the place of making of the contract. Goodwin Bros. Leasing, Inc. v. H.& B., Inc., 597 S.W.2d 303 (Tenn. 1980), reh'g denied, (1980). Finally, the Sixth Circuit has noted that "[t]he statute of limitations of the forum state applies in federal diversity cases. . . ." Atlantic Richfield Co. v. Monarch Leasing Co., 84 F.3d 204, 205 (6th Cir. 1996). Both parties rely upon Tennessee law.

Under Tennessee law, as a matter of general contract law principles, "[t]he ascertainment of the intention of the parties to a written contract is a question of law or judicial function for the court to perform when the language is plain, simple and unambiguous." Forde v. Fisk University, 661 S.W.2d 883, 887 (Ten. Ct. App. 1983) (citing Petty v. Sloan, 277 S.W.2d 355, 358 (Tenn. 1955)). But, "where the writing is not plain and unambiguous, and is such to require the aid of [parol] evidence, and the [parol] evidence is conflicting or such as admits of more than one conclusion, it is not error to submit the doubtful part under proper instructions to the jury." Id.

Yet, as this Court observed, ambiguity as to a contract's term is not created because the parties disagree as to its meaning. Oman Construction Co. v. Tennessee Valley Auth., 486 F. Supp. 375, 382 (M.D. Tenn. 1979). When clear contract language reveals the intent of the parties, there is no need to apply rules of construction. Id. One party's view of the contract does not necessarily mean that such provisions are part of the contract. In re D.L. Bouldin Constr. Co., 6 B.R. 288, 295 (Bankr. E.D. Tenn. 1980). Tennessee law generally allows enforcement of the parties' contract as written without questioning the wisdom of the contract or the harshness of its enforcement absent some public policy consideration. Metropolitan Life Ins. Co. v. Humphrey, 672 S.W.2d 782, 786 (Tenn. Ct. App. 1984); see also In re Dynamic Enter., 32 B.R.

-13-

509, 518 (Bankr. M.D. Tenn. 1983).

In the absence of fraud or mistake, an unambiguous written contract must be interpreted and enforced according to its plain terms.  See FDIC v. Armstrong, 784 F.2d 741, 744 (6th Cir. 1986); Cocke County Bf. of Highway Comm'rs v. Newport Utils. Bds., 690 S.W.2d 231, 237 (Tenn. 1985).  See also Tenn. Code Ann. § 47-50-112(a) (2000) ("All contracts . . . in writing and signed by the party to be bound . . . shall be prima facie evidence that the contract contains the true intention of the parties, and shall be enforced as written. . . .").  A contract is ambiguous only when its meaning is unclear and the contract language may be understood in more ways than one.  Empress Health & Beauty Spa, Inc. v. Turner, 503 S.W.2d 188, 190-91 (Tenn. 1973).

In construing a contract, the entire contract should be considered.  Newport, 690 S.W.2d at 237 (citing Crouch v. Shepard, 44 Tenn. 383, 4 Cold. 383 (1867)).  Under Tennessee law, a contract "must be viewed from beginning to end and all its terms must pass in review, for one clause may modify, limit or illuminate another." Associated Press v. WGNS, Inc., 348 S.W.2d 507, 512 (Tenn. Ct. App. 1961).

Under Tennessee law, a contract can be expressed, implied, written, or oral, but an enforceable contract must, among other elements, result from a meeting of the minds and must be sufficiently definite to be enforced. Johnson v. Central National Ins. Co. of Omaha, Neb., 356 S.W.2d 277, 281 (1962); Price v. Mercury Supply Co., Inc., 682 S.W.2d 924 (Tenn. Ct. App. 1984). The contemplated mutual assent and meeting of the minds cannot be accomplished by the unilateral action of one party, nor can it be accomplished by an ambiguous course of dealing between the two parties from which differing inferences regarding continuation or modification of the original contract might reasonably be drawn.  Batson v. Pleasant View Utility Dist., 592

-14-

S.W.2d 578, 582 (Tenn. Ct. App. 1979). In addition, a mere expression of intent or a general willingness to do something does not amount to an "offer." Talley v. Curtis, 129 S.W.2d 1099, 1102 (Tenn. Ct. App. 1939).

While neither party disputes that the Advance Agreement constitutes a contract, the parties do dispute the appropriate categorization of this contract. DuPont contends that the Advance Agreement was effectively for a loan, and thus subject to the six (6) year statute of limitations set forth in Tenn. Code Ann. § 28-3-109 for "Actions on contracts not otherwise expressly provided for." ANC argues, however, that the Advance Agreement constitutes a contract for the future purchase of goods, and therefore is subject to a four (4) year statute of limitations set forth for "Contracts for sale" under the Uniform Commercial Code, codified at Tenn. Code Ann. § 47-2-725(1). ANC further argues that because the four year statute of limitations applies, and the Advance Agreement was breached by nonpayment on November 1, 2001, the statute of limitations has expired and DuPont cannot recover on the Advance Agreement.

In support of its position, ANC cites to Tenn. Code Ann. § 47-2-106 that defines a "Contract for sale" as including "both a present sale of goods and a contract to sell goods at a future time." Article 2 of the UCC "applies to transactions in goods; it does not apply to any transaction which although in the form of an unconditional contract to sell or present sale is intended to operate **only** as a security transaction." Tenn. Code Ann. § 47-2-102 (emphasis added). Thus, the key issue turns on whether the Advance Agreement was a contract for the future purchase of goods or a security transaction.

Tennessee courts have not precisely addressed the distinction between contracts for the

-15-

sale of goods and those constituting a security transaction. In analyzing the appropriate category for contracts in other contexts, however, Tennessee courts apply the "predominant factor test," wherein the transaction's character is viewed as a whole. Hudson v. Town & Country True Value Hardware, Inc., 666 S.W.2d 51, 53 (Tenn. 1984). Applying that test in Hudson, the Tennessee Supreme Court held that if the predominant assets to be transferred were goods, the UCC governed, but if the predominant assets were non-goods, the UCC had no application. Id. Finally, a Tennessee court noted in a breach of contract action regarding an automobile purchase, "[i]n this case, we are dealing with a "future" good because the Suburban had not yet been manufactured. However, it is still treated as a contract to sell goods under the UCC, and, therefore, the Friendly transaction will be governed by the Tennessee UCC." Schacter v. Friendly Chevrolet Cadillac Toyota, Inc., No. 02A01-9603-CH-00060, 1996 WL 895464, at *3 (Tenn. Ct. App. Dec. 30, 1996).

While Tennessee courts and the Sixth Circuit Court of Appeals have not directly addressed this issue, other courts' treatment of this matter under similar state laws is instructive. In Butler v. IMA Regiomontana S.A. de C.V., No. 98-16735, 2000 WL 127125, at *1 (9th Cir. Feb. 3, 2000), the Ninth Circuit applied Arizona law in addressing issues strikingly similar to those presented here. In that case, the buyer made an advance payment of $90,000 for purchasing tile from a seller that was to be repaid to the buyer with interest. Id. The Ninth Circuit affirmed the judgment of the district court that the contract constituted a sale of goods and was therefore subject to the UCC. Id. at *2. The Ninth Circuit made this determination despite the fact that one party strongly maintained the transaction was a loan, and that representatives from both parties (including the counsel arguing for application of the UCC) referred to the contract as a

-16-

"note" or a "loan."

Other district courts in this circuit have also found that where two contracting parties intend for an agreement to operate as a contract to sell goods at a future time, Article 2 governs. In Columbia Gas Transmission Corp. v. Larry H. Wright, Inc., 443 F. Supp. 14, 19 (D.C. Ohio 1977). In Columbia Gas, the plaintiff had advanced the defendant money to build infrastructure that would ultimately lead to the purchase of natural gas by the plaintiff from the defendant. Id. The district court found that although the defendant had a duty under the agreement to repay the advance, the advance would not have been made but for the ultimate purchase of defendant's natural gas reserves. Id. Thus, the district court found that Article 2 of the UCC governed the parties' contract.

A review of other cases demonstrates that courts examining similar issues have only held Article 2 of the UCC does not apply where a lease and/or a third-party financier is involved, thus creating a definitive security transaction. See General Elec. Credit Corp. of Tennessee v. Ger-Beck, 806 F.2d 1207 (3d Cir. 1986); Bank of Nova Scotia v. Equitable Financial Management, Inc., 882 F.2d 81, 83 (3d Cir. 1989); Kimco Leasing Co. v. Lake Hortonia Properties, 640 A.2d 18, 21, 161 Vt. 425, 430 (1993); Financial Pacific Co. v. Quinn, 1997 WL 662058, at *3, 87 Wash. App. 1110 (Wash. Ct. App. 1997). DuPont particularly relies on Orix Financial Services, Inc. v. W.L. Holmes, No. 06-Civ.3476 (SAS), 2007 WL 3143707 (S.D.N.Y. Oct. 26, 2007), but there the purchaser specifically signed a security agreement that was subsequently transferred to a third-party financier. Id. at *1. That contract also differed from the one here in that it was a "Conditional Sale Contract Note," and the contract specifically provided that the "buyer ... agrees and promises to pay to the order of Seller **or any assignee or endorsee** .

-17-

. . hereof" the money due on the contract. Id. at *5 (emphasis added). That contract also carefully articulated the rights and obligations between the buyer and the holder of the note. Id.

Unlike Orix, the Advance Agreement here predominately functions as an agreement for the future purchase of goods, and it is clear from the undisputed facts that the parties did not intend to create an agreement that predominantly functioned as a security agreement. Both parties agree that ANC covenanted to repay the $500,000.00 through **discounts on future product purchases**. This strongly indicates that the goal of both parties was that the Advance Agreement would facilitate the purchase of goods. The Purchase Order from DuPont itself included language:

> To cover prepayment cost of $500,000 for "PET scrim" for DuPont Old Hickory during the next twelve months **in exchange for a lower unit price per square yard of "PET scrim"**. . . . DuPont Old Hickory presently forecasts purchasing approx. 53.778 million square yards of products within the twelve month time frame. Each square yard of fabric will be discounted $.01/square yard to cover the cost of prepayment. In the event that a fabric price is reduced or changed, the discount of $0.01 will stay the same **until 53.778 million square yards of product are purchased** (taking into account any yardage credits due to fabric quality or other reasons). In the event that DuPont Old Hickory purchases are accelerated, the amortization time will be effectively decreased. **In the event that DuPont Old Hickory does not intent [sic] to purchase** 53.778 million square yards of fabric within the 12 month time frame (rolling 3 month estimates will be provided each month), American Nonwovens will be notified and the remaining portion of the prepayment amount will be due within 15 months from the date of this purchase order.

(Docket Entry 48-3, Exhibit C, E-mail Purchase Order FML2850) (emphasis added). The plain language of the contract reflects that in consideration for the advanced funds, ANC would provide discounts on purchased scrim. The possible eventuality that DuPont would not purchase any scrim is worded so as to create a condition subsequent, and therefore supports ANC's position that the predominant purpose of the Advance Agreement was the purchase of goods.

-18-

Two other facts support the view that the Advance Agreement was a purchase of goods governed by the UCC. First, DuPont did in fact purchase scrim from ANC. DuPont acknowledges that those purchases created a credit against DuPont's advance. While DuPont argues that those purchases constitute separate agreements, those purchases were made at the rates set forth in the Advance Agreement and credited against ANC's obligations to repay under that same contract. As such, they were not separate agreements, but part of the overall Advance Agreement and help demonstrate that the Advance Agreement was primarily focused on the sale of goods, not the creation of a security transaction.

Second, DuPont's corporate representative, Karl Lukach, stated in his deposition that he lacked the authority to make loan agreements, but could make purchases of goods. (Docket Entry No. 58, Plaintiff's Response to Defendant's Statement of Undisputed Material Facts, at ¶¶ 7-8). Lukach specifically considered the advance to be "prepayment against purchases." Id. Finally, in addition to testifying about the authority his position with DuPont granted him, he stated:

> Q. Okay. Did you have ultimate authority to enter into the [Advance Agreement] at issue in this case, or did that have to receive approval above you?
>
> A. I believe I had authority to enter into this completely.

Id. at ¶ 11.

Because the Court finds that the material undisputed facts establish the predominant purpose of the Advance Agreement to be the purchase of goods, the Court concludes that the UCC applies.

Under the UCC, for this contract, the four (4) year statute of limitations set forth in Tenn.

-19-

Code Ann. § 47-2-725(1) applies. This action accrued on the date of ANC's breach that according to the terms of the Advance Agreement was November 1, 2001 (the date when ANC was required to repay the remaining balance of the original $500,000). As this action was not filed until September 25, 2007 (nearly six years after the breach occurred) the action to recover damages on the Advance Agreement contract is barred by the statute of limitations.

Additionally, the statute of limitations is not tolled due to ANC's subsequent promises to pay. Under Tennessee law, "performing what was already promised in the original contract is not consideration to support a second contract." Dunlop Tire & Rubber Corp., 667 S.W.2d 754, 759 (Tenn. Ct. App. 1983); see also Givens v. Mullikin ex rel. Estate of McElwaney, 75 S.W.3d 383, 406 (Tenn. 2002.). Beyond the bare assertions of DuPont's counsel, there is not any evidence on the record that suggests ANC requested DuPont's forbearance in filing suit on the Advance Agreement in consideration for its later promises to pay. As such, ANC's subsequent oral promises carry no legal effect and DuPont's claims under the Advance Agreement are time-barred.

As DuPont's claims for recovery under the Advance Agreement are time-barred by the statute of limitations, DuPont's motion for summary judgment on its claims under the Advance Agreement should be denied. Additionally, ANC's motion for summary judgment on the Advance Agreement claims should be granted.

### B. Engineering Services Agreement

DuPont also moves for summary judgment on its breach of contract and quantum meruit claims under the Engineering Services Agreement. In its response, ANC does not address the claims under the Engineering Services Agreement. In its Response to Plaintiff's Statement of

-20-

Material Undisputed Facts, however, ANC does not dispute that the parties entered into an agreement on or about January-April 2001 for DuPont to provide ANC with engineering services, and that ANC agreed to pay up to $120,000 for those services, and never disputed the charges with DuPont. (Docket Entry No. 55, Defendant's Response to Plaintiff's Statement of Undisputed Facts, at ¶¶ 22-26). After DuPont sent an invoice for $86,657.50 to ANC for the engineering services, ANC made two payments of $9,000.00 each toward the invoice. Id. at ¶¶ 25-26. ANC's last payment on the engineering services agreement occurred in February 2002 and left a balance of $68,657.50. Id. at ¶¶ 27. ANC does not dispute any of these facts.

To establish a claim for breach of contract under Tennessee law, a plaintiff must show: (1) the existence of a contract, (2) nonperformance amounting to a breach of that contract, and (3) damages caused by the breach of that contract. Life Care Ctrs. of America, Inc. v. Charles Town Assocs. Ltd. P'ship, 79 F.3d 496, 514 (6th Cir. 1996). DuPont has marshalled appropriate facts that satisfy all of these elements, and ANC has not disputed either the facts or the legal arguments regarding the Engineering Services Agreement in DuPont's motion for summary judgment. As such, DuPont's motion for summary judgment should be granted as to its breach of contract claim under the Engineering Services Agreement.

Additionally, DuPont's claims under the Engineering Services Agreement are governed by the six (6) year statute of limitations in Tenn. Code Ann.§ 28-3-109 for "Actions on contracts not otherwise expressly provided for." As the Engineering Services Agreement was for the provision of services and not goods, the UCC does not apply. Thus, the six year statute of limitations applies. ANC's breach of this agreement occurred, at the earliest, in February 2002. As DuPont filed suit on September 25, 2007, this is within the applicable statute of limitations

-21-

and DuPont's claims under the Engineering Services Agreement are not time-barred.

## C. Prejudgment Interest

Finally, DuPont argues that it is entitled to prejudgment interest under Tenn. Code Ann. 47-14-103(3) of ten percent (10%) per annum. DuPont seeks prejudgment interest on the final balance of each obligation from the last partial payment date. ANC does not respond to DuPont's claims for prejudgment interest. DuPont has established through the undisputed facts that it was owed $68,657.50 on the Engineering Services Agreement as of February 2002. Accordingly, the Court concludes that prejudgment interest should be awarded at a rate of ten percent per annum, simple interest, from March 2002 until paid.

## III. Conclusion

For the above-stated reasons, the Court concludes that DuPont's motion for summary judgment (Docket Entry No. 50) should be granted in part and denied in part, and that ANC's motion for partial summary judgment (Docket Entry No. 46) should be granted.

An appropriate order is filed herewith.

**ENTERED** this the 20th day of April, 2009.

_____
WILLIAM J. HAYNES, JR.
United States District Judge

-22-